UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE FLORES,<br><br>                Plaintiff,<br><br>   v.<br><br>BIMBO BAKERIES USA, INC.,<br><br>                Defendant. | Case No.: 2:24-cv-03440-MEMF-RAO<br><br>**ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 28]** |

Before the Court is the Motion for Summary Judgment filed by Defendant Bimbo Bakeries USA, Inc. ECF No. 28. For the reasons stated herein, the Court hereby GRANTS IN PART the Motion for Summary Judgment.

/ / /

/ / /

I. **Factual & Procedural Background**

This action arises from Jose Flores's allegations that Defendant Bimbo Bakeries USA, Inc. ("BBU") discriminated against him based on his age. On March 27, 2024, Flores filed a complaint in Los Angeles Superior Court alleging (1) discrimination in violation of California's Fair Employment and Housing Act ("FEHA") and (2) failure to prevent violation of FEHA. ECF No. 1-1 ("Complaint"). On April 25, 2024, BBU removed the action to this Court. ECF No. 1.

On January 16, 2025, BBU filed the instant Motion for Summary Judgment. ECF No. 28. Pursuant to the Court's standing order, the parties filed a joint memorandum. ECF No. 28-1 ("MPA"). The parties filed a joint evidentiary appendix (ECF No. 28-2) and the supporting exhibits, declarations in support of their briefing (ECF Nos. 29-33), and a joint statement of uncontroverted facts (ECF No. 34). BBU filed objections to Flores's evidence. ECF No. 35.

II. **Applicable Law**

A. **Motions for Summary Judgment**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.

To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

**B.     *McDonnell Douglas* Framework**

Claims for employment discrimination use a burden-shifting framework based on the Supreme Court's decision in *McDonnell Douglas*. *See Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "When entertaining motions for summary judgment in employment discrimination cases arising under state law, federal courts sitting in diversity must apply the *McDonnell Douglas* burden-shifting scheme as a federal procedural rule." *Zeinali v. Raytheon Co.*, 636 F.3d 544, 552 (9th Cir. 2011) (internal alterations and citations omitted)

Under the framework, first, the plaintiff "bears the initial burden of establishing a prima facie case of employment discrimination." *Earl*, 658 F.3d at 1112. Second, once the plaintiff meets his or her initial burden, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* Third, "[i]f the employer articulates a legitimate reason, the plaintiff must raise a triable issue that the employer's proffered reason is pretext for unlawful discrimination." *Id.* The "second and third steps of the *McDonnell Douglas* framework necessarily require an inquiry into the defendant's proffered reasons for the adverse employment decision." *Zeinali*, 636 F.3d at 550. "The ultimate burden of persuasion remains with the plaintiff." *Earl*, 658 F.3d at 1112.

"A plaintiff may demonstrate pretext in either of two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Earl*, 658 F.3d at 1112–13. If the plaintiff relies on circumstantial evidence, "the plaintiff must produce 'specific' and 'substantial' facts to create a triable issue of pretext," although this burden is not an "onerous" one. *Id.* at 1113.

Even where termination is the result of a reduction in force, a plaintiff need not show they were replaced; "rather they need show 'through circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000).

III. **Findings of Fact**[1]

The Court finds the following material facts are established for trial under Federal Rules of Civil Procedure 56(a) and 56(g):

BBU operates over 55 bakeries throughout the United States, including one in El Segundo, California. SUF 1. The bakeries (or "sales centers") bake, sell, and distribute a variety of baked goods. *Id*. Flores began his employment with BBU in 1988, and was employed in the El Segundo sales ceter until July 20, 2023 when he was terminated from BBU. SUF 9, 15.

At the time of his termination, Flores was employed as a Market Sales Leader ("MSL")— responsible for driving sales growth in the markets, fostering relationships with the customers and store management, and ensuring that Route Sales Professionals sold and delivered BBU's products and services with excellence. SUF 11, 12. Throughout Flores's employment, Flores worked on the Hispanic-focused Bimbo, Marinela, and Barcel product line, also known as BMB or BMBE. SUF 16. At the time of his termination, another MSL had responsibility for products under the "traditional" line, which included other brands, and a third MSL was responsible for the "independent" business partners that sold and delivered still other brands. SUF 17.

At the time of his termination, Flores reported to Robert Correa, a Zone Sales Leader ("ZSL"), who he had known for about 20 years. SUF 10, 11. Although at an earlier point in their careers, Flores had supervised Correa, in 2016, Correa became the ZSL and Flores began reporting to him. *Id.*

In early 2023, BBU rolled out a new data-driven program designed to optimize sales and customer service, called the DSDE playbook. SUF 23. The DSDE playbook was designed to allow BBU to maximize information gathering, analysis, and up-to-the-minute reporting to optimize

---

[1] The facts set forth below are taken from the parties' respective Joint Statement of Uncontroverted Facts. ECF No. 34 ("SUF"). To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

In making these Findings of Fact, the Court considered BBU's Evidentiary Objections. ECF No. 35. The Court did not find any evidence objected to essential to finding any fact stated herein, and therefore need not reach the Evidentiary Objections.

product ordering and customer service through its sales force, including MSLs. SUF 24. As part of the DSDE playbook, BBU expected Flores to use a tablet with a program called the BOOM App. SUF 25. Using the BOOM App, MSLs had important real time data at their fingertips when working with customers to increase the number of displays and product sales. SUF 26. Flores struggled with use of the BOOM App program, preferring a "pen and paper" approach. SUF 27. Flores had been told that he needed to improve his use of various data systems that BBU used to drive sales. SUF 28.

After Flores was trained on the DSDE playbook, BBU assessed his performance and that of the other MSLs who reported to Correa over the course of two diagnostic evaluations; these evaluations were conducted by BBU employees outside of El Segundo, not by Correa. SUF 29. At the time, eight MSLs reported to Correa. SUF 14.

The first assessment took place in February of 2023. SUF 30. On the first assessment, four MSLs, including Flores, scored below 2.0, and the average composite score of the MSLs reporting to Correa was 2.01. SUF 32; ECF Nos. 28-11, 28-13. Flores scored 1.54. SUF 31. The second assessment took place in June of 2023. SUF 30. On the second assessment, all MSLs, except Flores, scored above 2.0. *Id.* The average composite score of the MSLs reporting to Correa was 2.38 on the second assessment. ECF Nos. 28-11, 28-13. Flores scored 1.88, 0.33 higher than on the first assessment. SUF 31.

In June of 2023, Correa also learned that BBU was undertaking a wholesale restructuring of its operations in Southern California—including El Segundo, Flores's sales center. SUF 33. This restructuring was to include how it approached management oversight of product distribution, and to result in across-the-country headcount reductions at all leadership levels. *Id*. The goal of the reorganization was to change the way BBU went to market, reduce confusion and miscommunication among customers, and provide one single point of contact for BBU. SUF 35. Prior to the reorganization, multiple MSLs, each overseeing their separate product lines, might interface with a given store that carried multiple brands. SUF 34. One aim of the reorganization was to instead have one MSL—rather than three—oversee all brands in a particular territory, whether BMB, traditional, or independent. *Id*.

To effectuate the reorganization, Correa's manager, Pablo Miramontes, held a day-long meeting with ZSLs that reported to him to decide which MSLs would remain under the reorganization. SUF 37. Miramontes therefore asked the ZSLs to rank the MSLs that reported to them. SUF 39. Correa ranked Flores at the bottom. SUF 40. Judas Vera, a new MSL hired in May of 2023, was not ranked at this time. SUF 79. Flores's ranking was due to Correa's perception that Flores did not demonstrate the requisite improvement with the DSDE playbook, was not advancing towards BBU's goals, and was not engaged with the new tools available to him (such as the BOOM App and another computer program called Viva Engage). SUF 41. Correa also believed Flores would have difficulty adapting to the increased responsibilities for the new MSL role including overseeing unfamiliar products, and that he may have difficulty communicating with primarily English-speaking store directors, managers, and associates in the non-BMB lines of business. *Id.* Correa stated he did not consider age in his ranking process. SUF 45.[2]

After this, Juan Mercado, a ZSL for a different line of business, reached out to Correa to discuss Flores. SUF 52. Mercado, who had previously worked with Flores, had an opening in his organization and thought that Flores would be a good fit. SUF 53. This was conveyed to Miramontes, who agreed to offer Flores the position with Mercado. SUF 54.

Correa then approached Flores and asked Flores if he would be interested in the position under Mercado. SUF 55. He also asked Flores whether—if he was given a retirement package—he would accept, to which Flores responded that he would. SUF 56. The parties dispute what responses Flores gave, but after the meeting, Correa relayed to management, including Mercado, that Flores was not interested in the position with Mercado and that he instead was interested in retiring. SUF 57. The prior year, Flores had also conveyed to a colleague his interest in retirement, and had taken some steps to prepare for retirement, including finishing construction of his house in Mexico. SUF 19, 22. Flores had seen others retire from BBU and receive separation packages, and wanted the same for himself. SUF 20.

---

[2] At the hearing, counsel for Flores stated that this fact was undisputed to the extent that Correa's stated reasons for his ranking did not include age, but clarified that whether Correa may have otherwise improperly considered Flores's age was in dispute.

7

Ten days after the meeting with Correa, Flores was terminated with an offer for 35 weeks of severance, which Flores did not accept. SUF 59, 60. One MSL was then assigned to oversee the broader sales operation in the region, including the BMB products Flores had previously been responsible for, along with the other BBU products; no one replaced Flores in the BMB-only role. SUF 58. In the region where Flores worked, BBU laid off approximately 39 management associates as part of the reorganization. SUF 48. In Flores's own unit, BBU laid off 10 individuals, nine of whom were MSLs. SUF 49.

At the time of Flores's termination, the ages of the eight MSLs who reported to Correa were 60, 58 (Flores), 57, 54, 48, 39, 37, and 33. SUF 14. The 60-year old MSL was not terminated. SUF 46. In its reorganization, BBU retained 73 MSLs and terminated 9 MSLs. SUF 76. Of the 73 retained MSLs, all but three of them were younger than Flores. SUF 77.

BBU's policies prohibit discrimination based on age. SUF 3. All associates at BBU are trained on and required to comply with the anti-discrimination and anti-retaliation policies, and failure to do so may result in disciplinary action. SUF 5. Associates can report policy violations to management by, for example, contacting their immediate supervisor, any member of the leadership team, an anonymous computer/telephone hotline, or Human Relations. SUF 6. At no time during his employment did Flores ever raise any complaints of discrimination to BBU. SUF 7.

Correa has never been an officer, director, or managing agent of BBU and did not have responsibility for determining or setting any corporate policy for BBU. SUF 70, 71. Miramontes has never been an officer, director, or managing agent of BBU and did not have responsibility for determining or setting any corporate policy for BBU. SUF 72, 73.

**IV.    Discussion**

BBU moves for summary judgment contending that the undisputed facts do not support Flores's claim for age discrimination and his derivative claim of failure to prevent. For the reasons discussed below, the Court GRANTS IN PART summary judgment.

/ / /

/ / /

A. **There Is A Dispute of Material Fact As To Flores's Discrimination Claim**

    i. <u>The undisputed facts establish a prima facie case of age discrimination.</u>

To establish a prima facie case of discrimination under FEHA, a plaintiff must show that "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action . . . and (4) some other circumstance suggests discriminatory motive." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 355 (2000). The parties do not dispute that Flores is part of a protected age range, nor that he suffered an adverse employment action. BBU contends however, that the undisputed facts show Flores was unqualified and do not suggest any discriminatory motive. However, the Court finds that drawing all inferences in his favor, the undisputed facts reflect that Flores was qualified for his position and the circumstances suggest a discriminatory motive.

Although BBU notes that it is undisputed that Flores "struggled" with using the new BOOM App and scored the lowest on the diagnostic assessment, BBU has not shown that this made Flores *unqualified* for the MSL job. There is no evidence that prior to the DSDE playbook rollout that Flores had any issues performing his job, and the reasonable inference from his long tenure at BBU is that he was adequately performing. More significantly, even though Flores scored lower than other MSLs on the diagnostic, there is nothing indicating that Flores scored too low to adequately perform the job going forward, nor that he was unable to improve. Actually, it is undisputed that Flores *did* improve from the first assessment to the second assessment. Correa's belief that Flores would have difficulty adapting appears to largely have stemmed in part from Flores's "struggle" with the DSDE playbook, as BBU has not identified any other actual deficiencies in Flores's performance. Although Correa also believed that Flores may have trouble communicating with primarily English-speaking stores (SUF 41), there is no evidence that Flores had any difficulty communicating in English. There is no evidence that Flores could not have performed adequately as an MSL post-reorganization. Finally, it is undisputed that Correa, Miramontes, and Mercado all believed Flores to be fit for an MSL job under Mercado. Ultimately, Flores was not terminated for poor performance or because there was no position for which he was a good fit. Accordingly, a reasonable jury could find that Flores was qualified for the MSL job.

BBU also appears to contest that the circumstances do not suggest any discriminatory motive because Flores has not identified any direct evidence that his termination was motivated by age. However, there is a dispute of material fact with respect to the circumstances of his termination, and the Court finds that drawing all inferences in favor of Flores as the non-moving party—which this Court is required to do—the circumstances of his termination could suggest a discriminatory motive. In particular, the parties dispute what response Flores gave in the meeting with Correa regarding his preferences. Flores asserts that he told Correa he was interested in a position under Mercado and did not express a preference for retiring, and BBU asserts that Flores expressed a preference for retiring over the alternative position. It is undisputed that Correa conveyed back to management that Flores was not interested in continuing to work as an MSL for Mercado but was rather interested in retiring. SUF 57. Should a jury find that Flores expressed no preference for retiring, they could find that Correa's relaying the opposite to the management team and Mercado was the result of an improper motive—even if that improper motive was not directly expressed. This is bolstered by the views Correa expressed that Flores "was going to have a difficult time" with "being agile" and "changing." ECF No. 28-6 ("Correa Depo") at 51:10-52:20. Although not explicitly linked to his age, the Court finds that a reasonable jury could infer that these views stem from possible bias related to Flores's age.[3] This is true even if Correa did not consciously consider Flores's age in his decision-making. Moreover, there is other circumstantial evidence, including the ages of the other MSLs, and the relative ages of Flores and Correa.

BBU cites *Coleman* to support its position that Flores has failed to make out a prima facie case. In *Coleman*, the plaintiffs asserted that management used the word "promotable" as a synonym for "young," and that supported an inference of a discriminatory motive. But under the facts of that case—where the reorganization at issue had made promotability a key issue—the Ninth Circuit found that management's use of the word "promotable" did not by itself give rise to such an inference. 232 F.3d at 1284. However, the Court notes that the *Coleman* analysis of the use of the

---

[3] The Court also does not find that Correa's own age precludes him from having bias against someone older than him—Flores was at all times over ten years older than Correa.

term "promotable" occurred at the second step—whether the defendant's reasons for terminating the plaintiff were pretexts for age discrimination. *Id.* at 1285. There was no dispute in *Coleman* about the first step—that the plaintiff had met the prima facie case.

Rather, *Coleman* supports that the prima facie case, which requires a "low threshold" to meet, is met here. *Id.* at 1282. BBU points to the fact that no one directly replaced Flores to show a lack of discriminatory motive. But *Coleman* makes clear that even where an employee is not directly replaced, a plaintiff can meet its prima facie burden by showing that "the employer had a continuing need for their skills and services . . . or by showing that others not in their protected class were treated more favorably." *Id.* Here, BBU hired Judas Vera, a younger and newer employee, to backfill a different MSL position in May of 2023, and importantly—was not ranked in the diagnostic assessments. This is significant because Correa's stated reasons for ranking Flores lower than the other MSLs appear in large part to have stemmed from Flores's low diagnostic assessment—yet, without any comparable indicator for Vera, still ultimately ranked Flores lower than Vera. A reasonable inference is that younger employees were presumed to be able to adapt faster or have a better handle with the new technology even in the absence of any objective indicators of such. This is further supported by the undisputed results of the reorganization—a vast majority of MSLs retained were younger than Flores. The Court finds these facts sufficient to establish a prima facie case of discrimination.

### ii. The undisputed facts do not show a non-discriminatory reason for termination.

After a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to show that there was a legitimate, non-disciminatory for the termination. Here, although the Court acknowledges that BBU has provided a legimate, non-discriminatory reason for its *reorganization*,[4] the Court does not find that BBU has provided a legitimate, non-discriminatory reason for *Flores's termination*. There are no undisputed facts showing that BBU needed to

---

[4] It is undisputed that BBU initiated a restructuring of its operations as a whole in 2023. BBU wanted to consolidate its multiple product lines to the oversight of a smaller amount of MSLs, in part to reduce confusion and miscommunications among its customers. Flores does not dispute that the "motivation behind the reorganization was entirely the decision to restructure how BBU approaches the market." SUF 36.

terminate any number of people as part of the reorganization. Rather, it is undisputed that Flores did not have to be terminated, as BBU was prepared to offer him a position under Mercado instead. Yet, Flores was terminated without further notice despite expressing an interest in taking this position.[5]

It appears that BBU's theory is that Flores expressed an interest to Correa in retiring over taking a position under Mercado, but this is disputed by Flores. Drawing all inferences in Flores's favor, Flores did want the position that was offered to him—therefore there was no reason for his termination, irrespective of the broader reorganization. This material dispute of fact cannot be resolved on summary judgment. In the absence of any rationale for Flores's ultimate termination, the Court finds that BBU has failed to meet its burden on summary judgment to establish a legitimate, non-discriminatory reason for Flores's termination. Accordingly, the Court DENIES summary judgment to BBU on Flores's discrimination claim.

### B. There Is A Dispute of Material Fact as to Flores's Failure to Prevent Claim

BBU moves on Flores's failure to prevent claim on the basis that it is "entirely derivative" of his discrimination claim. MSJ at 44.

As the Court has denied summary judgment on his discrimination claim, the Court DENIES summary judgment to BBU on the failure to prevent claim.

### C. Flores is Not Entitled to Punitive Damages Based on the Undisputed Facts

There is a high burden to win punitive damages against an employer in California. To win punitive damages, Flores must show that an "officer, director, or managing agent" engaged in an "act of oppression, fraud, or malice," or consciously disregarded, authorized, or ratified such an act. *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 572 (1999). Mere negligence by the corporation is insufficient. *See id.* Further, managing agents are defined narrowly as "corporate employees who

---

[5] At the hearing, counsel for BBU emphasized that the decision to terminate Flores had already been made prior to considering him for this new position, and therefore this consideration cannot provide a basis for discrimination animus. However, the Court finds that slating an employee for termination does not have the same final effect as terminating an employee, as the company could still change its mind (as it attempted to do with Flores in this circumstance). Moreover, the Court notes that it is undisputed *Correa* was the one who selected Flores for termination. SUFS 70, 72. Mercado appears to have been the one who suggested taking Flores on, which was approved by Miramontes. ECF No. 28-17, Ex. 11. A reasonable inference is that while Mercado and Miramontes wanted to keep Flores, Correa not only made the ranking that led to Flores's termination, he also relayed to them that Flores wanted to retire to keep Flores from this new position.

exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." *Id.* at 566. Even if a manager has authority to hire and fire other employees, that alone is insufficient to establish the manager as a "managing agent." *See id.*

Here, Flores does not dispute that Correa and Miramontes, the individuals who were responsible for the decision to terminate him, were not managing agents under governing law. Accordingly, he is not entitled to recover punitive damages from them, regardless of the jury's findings on their conduct with respect to him. The Court therefore GRANTS summary judgment to BBU on the issue of punitive damages.

## V. Conclusion

For the foregoing reasons, the Court hereby ORDERS as follows:

1. The Motion for Summary Judgment is DENIED as to Flores's First Cause of Action;
2. The Motion for Summary Judgment is DENIED as to Flores's Second Cause of Action; and
3. The Motion for Summary Judgment is GRANTED as to Flores's claim for punitive damages.

IT IS SO ORDERED.

Dated: March 11, 2025

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge